ROY H. JOHNSON, W. CONNETTE JOHNSON, FORREST H. HARMON, LEWIS E. LAMB, JR., AND ALVIN A. STURDIVANT, JR., D/B/A KERNERS VILLAGE COMPANY v. PHOENIX MUTUAL LIFE INSURANCE COMPANY AND CAMERON-BROWN COMPANY

No. 7821SC1130

(Filed 18 December 1979)

1. Fraud § 1— elements

The essential elements of actionable fraud require that there be a material misrepresentation that relates to a past or existing fact, is definite or specific, was made with knowledge of its falsity or culpable ignorance of its truth, was made with the intention that it should be acted upon, and causes reasonable reliance on the part of the recipient of the misrepresentation to his detriment.

2. Fraud § 12— construction of shopping center—procuring mortgage loan—substitution of tenants—summary judgment improper

In an action to recover for fraud by defendant Cameron-Brown, which had been given the exclusive right to negotiate a permanent mortgage loan for plaintiff partners to construct a shopping center, evidence of defendant's fraud was sufficient to be submitted to the jury and the trial court erred in entering summary judgment for defendant where such evidence tended to show that an agent of defendant had told plaintiffs that their having secured four named tenants for the shopping center was sufficient for defendant insurance company to make the permanent loan and that the other tenants would be no problem; the agent represented to plaintiffs that substitution of tenants would be no problem; the agent intended that plaintiffs rely on these representations and advance funds toward the project's completion; there was ample evidence that the agent knew or had reason to believe that his representation as to the ease of substitution was false; plaintiff's attempts to obtain other tenants proved difficult under the terms of defendant insurance company's loan com-

Johnson v. Insurance Co.

mitment; the agent knew or had reason to believe that the commitment was conditioned on leases which had not been, and might never be, negotiated, especially a bank lease; plaintiffs entered into a construction loan agreement with a bank which required plaintiffs to comply with the terms of its commitment with defendant insurance company, and the construction lender insisted that plaintiffs comply with that part of the commitment requiring plaintiffs to have a ground lease with a named bank; and because plaintiffs were unable to satisfy defendant insurance company, the construction lender refused to advance construction funds, and defendant insurance company subsequently exercised its option to terminate the loan commitment.

**3. Fraud § 12— procurer of mortgage loan—fiduciary relationship—constructive fraud—summary judgment improper**

In an action to recover for fraud by defendant, who had been given the exclusive right to negotiate a permanent mortgage loan for plaintiff partners to construct a shopping center, the trial court erred in entering summary judgment for defendant where the evidence tended to show that an agency relationship existed between plaintiffs and defendant, that plaintiffs placed great reliance on representations by defendant's agent, and that defendant was deeply involved in negotiations between plaintiffs and defendant insurance company, since the evidence did not show that, as a matter of law, no confidential or fiduciary relationship was established between plaintiffs and defendant, and evidence was sufficient to show that defendant was therefore guilty of constructive fraud.

**4. Unfair Competition § 1— procurer of mortgage loan—regulation by Fair Trade Act**

Defendant Cameron-Brown was engaged in the commerce or trade of selling its services as a loan finder for plaintiffs' permanent loan and therefore was regulated by G.S. Chapter 75 prohibiting unfair and deceptive trade practices.

**5. Limitation of Actions § 8.1— fraud—time of discovery**

Plaintiffs' claims of fraud and unfair and deceptive trade practices against defendant, who was to negotiate a permanent mortgage loan for them to construct a shopping center, were not barred by the statute of limitations where plaintiffs only gradually became aware of the facts constituting fraud, and plaintiffs were not made aware of such facts by the time a bank terminated its construction loan commitment with plaintiffs.

Judge CLARK dissenting.

APPEAL by plaintiffs from *McConnell, Judge.* Judgment entered 18 May 1978 in Superior Court, FORSYTH County. Heard in the Court of Appeals 31 August 1979.

The plaintiffs in this action are partners in a partnership named Kerners Village Company (KVC), formed in March 1973 to develop a shopping center near Kernersville, North Carolina. In May 1973 KVC entered into a written agreement with defendant

Cameron-Brown Company (Cameron) giving Cameron the exclusive right to negotiate a permanent mortgage loan for $1,350,000 with interest at an annual rate of 8½ percent. At the time KVC authorized Cameron to seek a loan commitment, KVC had negotiated only four leases for the center: Lowe's, Macks, Revco, and Goodyear. These were regarded by KVC and Ralph W. Mullins, Cameron's agent, as major credit tenants. KVC had informed Mullins that while they were discussing possible leases with Sears and the Bank of North Carolina, such leases had not been secured. Mullins sought a loan commitment from Phoenix Mutual Life Insurance Company (Phoenix).

In early July, not having received a commitment, KVC contacted Mullins expressing its concern about delays in the project and informing Mullins that it had other lenders who were interested in making a loan for the project. Mullins then urged Phoenix to make a prompt offer. On 20 July 1973, Phoenix tendered a commitment to KVC for a fifteen-year loan of $1,300,000 at nine percent interest. KVC accepted the commitment in a letter dated 30 July 1973 subject to two conditions. On 14 August 1973 Phoenix modified its loan commitment offer along lines similar to those suggested by KVC, and KVC accepted the offer as modified on 30 August 1973.

The loan commitment was conditioned, *inter alia*, on there being in effect at the time of the closing leases to Lowe's Foods, Inc., Macks Stores, Inc., Revco, Inc., Goodyear Co., Sears Catalogue Store, and the Bank of North Carolina, for given terms of fifteen or twenty years, each at a specified annual rent. The loan commitment further required that KVC find an interim construction lender reasonably acceptable to Phoenix who would be willing to agree to assign the loan to Phoenix at par upon completion of construction. The loan commitment provided, "This commitment may be terminated at our election if such agreement has not been delivered to us within ninety days from the date of your acceptance of this commitment." Following these events, KVC paid Cameron a loan commitment fee of $13,000 and Phoenix a stand-by fee of $26,000.

In early September, KVC informed Mullins that Sears had declined to enter a lease, but that Pic-'N-Pay Stores was available as a substitute. Mullins recommended to Phoenix that Pic-'N-Pay

be substituted for Sears. Further discussions took place between Mullins and KVC as to a reduction in the total square feet available for rent in the project. On 9 October 1973, Mullins wrote to Phoenix, providing a revised schedule of estimated income for the center. On 27 November 1973, KVC sent Mullins an amendment to the commitment in which Phoenix agreed to substitute Pic-'N-Pay, but also proposed to reduce the loan to $1,200,000. KVC accepted the revised commitment and on 4 December 1973 Mullins returned it to Phoenix.

Pic-'N-Pay did not sign and on 7 January 1974 Mullins informed Phoenix of this development and requested that Phoenix allow future substitution of an unknown tenant for Pic-'N-Pay. On 22 January 1974 Phoenix wrote to Mullins advising that it would allow substitution of Pic-'N-Pay, but would require $140,260 per year *in credit lease income, including the bank lease,* to substantiate the $1,200,000 loan. Mullins promptly advised KVC of Phoenix's response. Mullins resigned from Cameron on 31 January 1974.

KVC did not obtain a firm commitment from the Bank of North Carolina or any other bank because approval by the North Carolina Banking Commission prior to the commencement of construction could not be obtained. Due to the above difficulties and the inability of KVC to raise the $100,000 difference in permanent loan financing, KVC's construction lender, North Carolina National Bank (NCNB) refused to advance funds. As a result of the delay in obtaining financing for the project, construction costs increased, necessitating renegotiation of all the leases. Subsequent negotiations between the parties proved unsuccessful and Phoenix terminated the commitment by letter dated 16 July 1974. Requests by KVC to obtain a refund of the $26,000 stand-by fee it had paid to Phoenix and the $13,000 placement fee it had paid to Cameron were denied.

Through its partners KVC filed suit against Phoenix and Cameron alleging that the defendants entered into a deliberate course of conduct designed to force KVC into an untenable economic condition so that completion of the project would be impossible. KVC averred that on 17 June 1974 Phoenix cancelled its previous loan commitments and issued a new one at a higher interest rate with a hold-back clause for $250,000 knowing its offer

would be unacceptable to KVC and KVC would be forced to abandon its project. The complaint alleged that as a result of the defendants' actions, compliance with earlier loan commitments was rendered impossible and that the above actions constituted unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes entitling KVC to treble damages and reasonable attorney's fees. Plaintiffs additionally averred that the stand-by fee collected by Phoenix and placement fee they paid Cameron were unearned and accordingly should be returned.

Defendants answered plaintiff's complaint denying liability for any damage sustained by KVC and moved for summary judgment under G.S. 1A-1, Rule 56. This motion was granted by the trial court, based upon the pleadings, the dispositions of all partners comprising KVC, the deposition of agent Fredrick A. Osmers of Phoenix, and the affidavit of agent Ralph W. Mullins (Mullins) of Cameron. From this judgment plaintiffs appeal.

*Badgett, Calaway, Phillips, Davis & Montaquila, by Chester C. Davis, for plaintiffs appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by John L. Jernigan and Raymond H. Goodmon III, for defendant appellee Cameron-Brown Company.*

*Cansler, Lockhart, Parker & Young, P.A., by Thomas Ashe Lockhart and George K. Evans, Jr., for defendant appellee Phoenix Mutual Life Insurance Company.*

WELLS, Judge.

The single issue presented in this appeal is whether the trial court erred in granting defendants' motions for summary judgment. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." G.S. 1A-1, Rule 56(c); *Cox v. Funk*, 42 N.C. App. 32, 255 S.E. 2d 600 (1979).

[1] "Summary judgment is apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and

voluminous depositions." 6 Moore's Federal Practice ¶ 56.17 [27], p. 866 (2d ed. 1979). The case before us is precisely such an action. Plaintiffs contend that Mullins' statement as to the ease with which plaintiffs could substitute other tenants for the minor tenants which would have to be listed in the loan commitment were false and fraudulent. The essential elements of actionable fraud require that there be a material misrepresentation that: 1) relates to a past or existing fact; 2) is definite and specific; 3) was made with knowledge of its falsity or culpable ignorance of its truth; 4) was made with the intention that it should be acted upon; and 5) causes reasonable reliance on the part of the recipient of the misrepresentation to his detriment. *Rosenthal v. Perkins*, 42 N.C. App. 449, 257 S.E. 2d 63 (1979). In order for each defendant to prevail on its Rule 56 motion each must show that evidence of one or more of the above elements of fraud is unavailable to the plaintiffs. *Russo v. Mountain High, Inc.*, 38 N.C. App. 159, 247 S.E. 2d 654 (1978).

[2] The depositions before the trial court show a sufficient forecast of evidence that: 1) agent Mullins of Cameron had told KVC that their having secured Lowe's, Revco, Macks and Goodyear as tenants was sufficient for Phoenix to make the permanent loan and that the other tenants would be no problem; 2) Mullins intended that KVC rely on this representation and advance funds towards the project's completion; 3) KVC's attempts to obtain other tenants proved difficult under the loan commitment of 20 July 1973; 4) Mullins knew, or had reason to believe, that the commitment was conditioned on leases which had not been, and might never be, negotiated, especially the bank lease; 5) KVC entered into a construction loan agreement with NCNB which required KVC to comply with the terms of its commitment with Phoenix and NCNB insisted that KVC comply with that part of the Phoenix commitment requiring KVC to have a ground lease with the Bank of North Carolina; and 6) because KVC was unable to satisfy Phoenix, NCNB refused to advance construction funds and Phoenix subsequently exercised its option to terminate the loan commitment.

The depositions, based on first-hand knowledge of two of KVC's officers, reveal that Cameron, through agent Mullins, had represented to plaintiffs that substitution would be no problem.

According to Lewis E. Lamb, Jr., at the time KVC submitted its
original loan application:

> . . . Mr. Mullins reviewed the progress of the loan and he
> said, "You have secured the four major tenants, which is our
> primary interest." The four major tenants were Lowe's,
> Revco, Macks and I believe Goodyear. There was some
> discussion of the minor tenants, at which time we had some
> discussion of our negotiations with Sears, but he (Mullins)
> said that was of no consequence. He (Bill Mullins) said
> whoever your local, or minor, tenants are, that is—I can't
> recall if the word substitution was used, or something to that
> effect. Anyway, . . . what he was conveying was that . . . the
> loan was not contingent on the . . . smaller leases. He said,
> "you have gotten your four majors, [and] I have no reason to
> think that the loan will not . . . go through."

                              *    *    *

> At the first meeting, Mullins said these four major
> tenants were acceptable for the progress of the loan (i.e., the
> permanent financing for this shopping center.)

                              *    *    *

> Q. (Lockhart): So, when you signed Exhibit One (the July
> 20, 1973 loan commitment), you knew, and you were on
> notice, that if you and your associates did not have all of
> these leases specified in Paragraph Nine, that Phoenix would
> not have any obligation to make that loan, didn't you?

> A. No, I didn't because Mr. Mullins had told me dif-
> ferently.

> Q. Different from what you see in that letter there?

> A. Yes.

Similarly, in his deposition Roy Johnson stated that at the time
the KVC partners signed the loan commitment from Phoenix of
20 July 1973:

> Well, we didn't have [the] Sears Store. We didn't have a
> bank. We may or may not ever get Sears. That's what we
> knew at that time. But we did have four credit tenants with

Johnson v. Insurance Co.

> 73 percent of our space leased and substitutions were not a great problem in the minds of Bill Mullins or ourselves. . . . Well, let me restate that. He led us to believe that there was no problem and he was the expert.

There can be no doubt that this representation was material and specific.

There is also ample evidence that Mullins knew or had reason to believe that his representation as to the ease of substitution was false. Roy Johnson stated in his deposition that on 27 November 1973, at the time Phoenix offered to amend its previous loan commitment, "we had been assured by the people at Cameron-Brown that this would be one of the contingencies that would be taken out [of the commitment]." Nonetheless, Osmers, Phoenix's agent, stated:

> Q. (Davis): When was the first time that Mr. Mullins mentioned having a problem with the bank lease or of taking the bank requirement out of the loan commitment, do you recall?
>
> A. Never was mentioned at any time. . . . Never had any telephone conversations at all about the bank lease.

Osmers also stated in his deposition the importance of the bank ground lease to Phoenix:

> Q. And it was a matter of significance to the company in approving this project for a loan to have a bank at the facility where the shopping center would be?
>
> A. That's right. . . . The bank has stability, and they are considered usually good tenants, and in this instance, they were going to build their own improvements. . . .
>
> Q. It wasn't just the annual rent that the bank would produce, it was the character and nature of the banking business and the fact that the bank would be building its own improvements that would have value to the project?
>
> A. That's right.

There was also evidence that Cameron was unaware of the problem with the bank until a later date, that some substitutions were routinely granted by lenders such as Phoenix and that Roy

Johnson's personal knowledge of the events to which he testified during the deposition was limited. The previous testimony, however, was sufficient to raise a material issue of fact as to whether Mullins intentionally deceived plaintiffs or made culpably ignorant representations.

> The existence of fraud necessarily involves a question concerning the existence of a fraudulent intent on the part of the party accused of such fraud. The intent of a party is a state of mind generally within the exclusive knowledge of that party and, by necessity, must be proved by circumstantial evidence. Summary judgment is generally inappropriate under such circumstances.

*Bank v. Belk*, 41 N.C. App. 328, 339, 255 S.E. 2d 430, 437 (1979).

[3] We have been discussing the elements of *actual* fraud. Since the record contains evidence of an agency relationship between KVC and Cameron, that KVC placed great reliance on Mullins' representations, and that Cameron was deeply involved in the negotiations between KVC and Phoenix, we cannot say that, as a matter of law, no confidential or fiduciary relationship was established between KVC and Cameron. If Cameron should be found to have been KVC's agent, Cameron was a fiduciary. *Vail v. Vail*, 233 N.C. 109, 63 S.E. 2d 202 (1951). As such, Cameron could be found to have committed "constructive fraud" even in the absence of actual dishonesty or intent to defraud. *Priddy v. Lumber Co.*, 258 N.C. 653, 129 S.E. 2d 256 (1963).

There can be no dispute that the depositions provided ample evidence to show Mullins intended that KVC risk a great deal of the partners' capital in reliance on his representations that a loan would be forthcoming from Phoenix, or that large sums were lost by KVC when the project fell through. Under these circumstances the reasonableness of KVC's reliance on Mullins' alleged misrepresentations became a question to be resolved by the trier of fact. *See, Johnson v. Lockman*, 41 N.C. App. 54, 254 S.E. 2d 187 (1979), *disc. rev. denied*, 297 N.C. 610, 257 S.E. 2d 436 (1979). Similarly, it cannot be said that as a matter of law Mullins' alleged assurances regarding the availability of substitutions were merely opinions of what future action Phoenix would take with respect to KVC's requests to substitute, as contended by Cameron, which would render any such misrepresentations inac-

tionable. *See, e.g., Myrtle Apartments v. Casualty Co.*, 258 N.C. 49, 127 S.E. 2d 759 (1962). Given the expressed reliance by KVC on Mullins' expertise, a reliance which the evidence shows was encouraged by Mullins, Mullins' representations were factual in nature, an explanation of the terms and conditions of the commitment KVC was considering accepting from Phoenix, based on Mullins' prior experience.

On motion for summary judgment we cannot say that Phoenix's substitute loan commitment offer of 17 June 1974, which did not include a bank or Sears, but which stated a higher annual interest rate, plus a $250,000 "hold back" of funds by Phoenix unless certain conditions were met by plaintiffs, was sufficient to preclude plaintiffs from suffering any loss as a result of Mullins' alleged misrepresentations. Nor do we agree with defendant Cameron's contention that because the plaintiffs never found *any* substitute tenants to replace Sears and the Bank of North Carolina, any misrepresentation which Cameron may have made with respect to the ease of substitution was not a cause of the decisions of Phoenix and NCNB to cancel their respective loan commitments. The point is that from the depositions before the trial court, plaintiffs have shown a sufficient forecast of evidence showing difficulty in obtaining permission from Phoenix to substitute *anyone* other than a bank for the Bank of North Carolina. This evidence is sufficient to show that plaintiffs were fraudulently misled or misinformed by Cameron as to the extent of this difficulty. Plaintiffs, to survive defendant Cameron's motion for summary judgment, are not required to go through the mere formality of obtaining actual substitute tenants who would ultimately be rejected by Phoenix.

Neither are we convinced by defendant Cameron's argument that plaintiffs' damages were caused solely by NCNB's cancellation of its construction loan agreement. Under the specific terms of plaintiffs' commitment with NCNB, plaintiffs' construction loan was conditioned upon plaintiffs' "faithful and timely compliance with all the terms and conditions of [its] commitment [with Phoenix]." Phoenix cancelled its commitment to make a permanent loan on grounds that KVC had not obtained a construction loan. There is certainly a question of fact whether NCNB would have had the right to terminate its construction loan agreement with plaintiffs if substitution for the Bank of North Carolina had

been expeditiously permitted by Phoenix under the loan commitment between Phoenix and plaintiffs.

If plaintiffs were induced to employ defendant Cameron by fraudulent misrepresentations as to the ease of substitution for KVC's tenants, Cameron would be precluded by its conduct from retaining the $13,000 "placement fee" it had collected from plaintiffs. *Tuggle v. Haines*, 26 N.C. App. 365, 216 S.E. 2d 460 (1975), *cert. denied*, 288 N.C. 253, 217 S.E. 2d 681 (1975). The "placement fee" was clearly in the nature of a commission for obtaining a lender for KVC's permanent loan.

Although we have determined that the depositions presented a sufficient forecast of evidence available to plaintiffs showing that Cameron, through its agent Mullins, could have deceived and misled plaintiffs, there is no such evidence against Phoenix. All of the evidence adduced shows that Phoenix acted wholly within its contractual prerogative in cancelling its commitment with the plaintiffs. There was no forecast of evidence produced by plaintiffs in support of their allegation of collusion between Phoenix and Cameron to force plaintiffs to abandon their project. Nor was there any evidence produced of misconduct on the part of Phoenix.

Furthermore, from the uncontradicted deposition of Phoenix's agent, Osmers, Phoenix did not pay Cameron any commission or fee for placing the KVC loan and there was no apparent contractual or agency relation between Phoenix and Cameron. Accordingly, summary judgment for Phoenix on both plaintiffs' first cause of action concerning fraud as well as their second cause of action under Chapter 75 of the North Carolina General Statutes was properly granted by the trial court. Similarly, the record fails to show any evidence of Phoenix's willingness to cancel its original loan commitment unless the plaintiffs would enter into a substitute commitment. Under these circumstances there was no "mutual cancellation" of the original loan commitment, and summary judgment for defendant Phoenix was properly granted on plaintiffs' third cause of action. *See, Vickery v. Fisher Governor Co.*, 417 F. 2d 466 (9th Cir. 1969).

The trial court also dismissed plaintiffs' second cause of action against defendant Cameron brought pursuant to Chapter 75 of the North Carolina General Statutes. On 14 June 1977, at the

time plaintiffs filed their complaint in this action, G.S. 75-1.1 provided in pertinent part:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

> (b) The purpose of this section is to declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business, and between persons engaged in business and the consuming public within this State, to the end that good faith and fair dealings between buyers and sellers at all levels of commerce be had in this State.

> \* \* \*

> (d) Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim.

G.S. 75-1.1(a) and (b) were subsequently rewritten, effective as to actions commenced on or after 27 June 1977, to state:

> (a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

> (b) For the purposes of this section, "commerce" includes all business activities however denominated, but does not include professional services rendered by a member of a learned profession.

1977 N.C. Sess. Laws, ch. 747. The amendment, effective two weeks after the present action was filed, is not applicable here.

[4] Since we have held that there was sufficient evidence of fraud to withstand defendant Cameron's motion for summary judgment, this evidence would likewise be sufficient to constitute an unfair or deceptive act under G.S. 75-1.1(a). *Hardy v. Toler*, 288 N.C. 303, 218 S.E. 2d 342 (1975). Cameron, however, argues that prior case law and the qualifying language of G.S. 75-1.1(b) referring to "buyers and sellers" renders Chapter 75 inapplicable to the present action. We do not agree.

We have previously held that a real estate agency was engaged in "trade or commerce" within the purview of G.S. 75-1.1(a). *Rosenthal v. Perkins*, 42 N.C. App. 449, 257 S.E. 2d 63 (1979). Similarly, a Federal court applying North Carolina substantive law has held that chapter 75, as this statute was worded prior to the 1977 amendments, was applicable to the sale of insurance. *Ray v. Insurance Co.*, 430 F. Supp. 1353 (W.D.N.C. 1977). We hold that defendant Cameron was engaged in the commerce or trade of selling its services as a loan finder for plaintiffs' permanent loan, and as such, was regulated by Chapter 75. Our Supreme Court's decision in *State ex rel. Edmisten v. Penney, Co.*, 292 N.C. 311, 233 S.E. 2d 895 (1977), holding Chapter 75 inapplicable to debt collection practices, is factually distinguishable from the present action. In light of the General Assembly's action amending the statute virtually immediately after the *J. C. Penney* opinion was filed, we believe the Court's holding in that case should be narrowly construed.

[5] Defendant Cameron also argues that plaintiffs' claims for fraud and under Chapter 75 are barred by the statute of limitations. The three-year statute is applicable to both causes of action. G.S. 1-52(9); *Holley v. Coggin Pontiac, Inc.*, 43 N.C. App. 229, 259 S.E. 2d 1 (1979). However, the statute accrues from the time a reasonable person would be put on notice of the facts constituting fraud. *Driggers v. Commercial Credit Corp.*, 31 N.C. App. 561, 230 S.E. 2d 201 (1976). Whether a plaintiff should have discovered these facts more than three years prior to the institution of the action is ordinarily for the jury to decide. *Huss v. Huss*, 31 N.C. App. 463, 230 S.E. 2d 159 (1976).

In the present action there is evidence that plaintiffs only gradually became aware of the difficulty of substitution. We do not agree with defendant Cameron that, as a matter of law, plaintiffs were aware of the difficulty of substitution by 23 May 1974, the date NCNB terminated its construction loan commitment with plaintiffs. The record provides evidence that at that point in time Phoenix was preparing a proposal that would have deleted Sears and any bank from the loan commitment. A jury could reasonably find that plaintiffs could not have been expected to discover the fraud until after they realized the terms under which Phoenix would permit substitution.

We affirm the trial court's award of summary judgment as to defendant Phoenix on all plaintiffs' claims, and reverse the granting of defendant Cameron's motion for summary judgment as to plaintiffs' claims for fraud, violation of G.S. 75-1.1 and the return of plaintiffs' placement fee.

Affirmed in part and reversed in part.

Judge ERWIN concurs.

Judge CLARK dissents.

Judge CLARK dissenting.

The majority concludes that Mullins of Cameron-Brown falsely represented to the KVC partners that "substitution would be no problem."

Assuming that this conclusion is supported by the depositions of the partners and that it was a representation of subsisting fact rather than an opinion or promissory representation, it must be considered in light of the circumstance that Cameron-Brown was a loan broker without any duty to solicit and obtain tenants to occupy space in the Kerners Village project. Nor is there anything in the representation that would relieve the KVC partners of the duty to make a reasonable effort to obtain tenants acceptable to Phoenix. Subsequent to the so-called misrepresentation Phoenix did allow Pic-'N-Pay as a substitution for Sears with no problem to the partners. The statement in the majority opinion that "it cannot be said as a matter of law Mullins' alleged assurances regarding the *availability* of substitutions" (emphasis added) indicates to me that the representation was interpreted to mean that acceptable tenants were readily available rather than that acceptable tenants obtained by the partners could be substituted with ease or with no problem. That the partners did not find such tenants available does not have the retroactive effect of making Mullins' statements a misrepresentation which would constitute an element of actual fraud. Nor does the failure of the partners to find acceptable substitute tenants create a breach by Mullins of a fiduciary duty to disclose all material facts so as to constitute constructive fraud. It is my opinion that all defendants carried the burden of establishing that there was no

material issue of facts on plaintiffs' claims for fraud or for violation of G.S. 75-1.1, and I would affirm the summary judgment in favor of all defendants.